**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kelvin L. DUNIGAN, Defendant–Appellant.**

No. 97–5980.

United States Court of Appeals, Sixth Circuit.

Submitted Nov. 4, 1998.

Decided Jan. 8, 1999.

Robert E. Lindsay, Alan Hechtkopf and Frank P. Cihlar (briefed), U.S. Department of Justice, Appellate Section Tax Division, Washington, D.C., Wayne A. Rich, Jr., Assistant U.S. Attorney, Chattanooga, Tennessee, for Plaintiff–Appellee.

Deirdra J. Brown (briefed), Perry H. Piper, Federal Public Defender Services of Eastern Tennessee, Inc., Chattanooga, Tennessee, for Defendant–Appellant.

Before: MERRITT and COLE, Circuit Judges; EDMUNDS, District Judge.*

---

* The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

## OPINION

COLE, Circuit Judge.

Defendant–Appellant Kelvin L. Dunigan appeals the district court's judgment which requires him to pay full restitution in the amount of $311,605. Dunigan argues that the district court abused its discretion by ordering full restitution because it did not adequately consider his financial condition and ability to pay. For the following reasons, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

### I.

This case arose from Dunigan's organization of and participation in a scheme to obtain the payment of false refund claims from the Internal Revenue Service (IRS). Dunigan solicited individuals living in public housing projects in Chattanooga to file false 1991 and 1992 income tax returns. The individuals used their true names and social security numbers; however, Dunigan, or an individual working for Dunigan, supplied false W–2 forms that set forth fabricated employment and salary information for the individuals filing the returns. Additionally, Dunigan encouraged the individuals to list nonexistent dependent children on the returns so that they could file as a head-of-the-household and obtain earned income tax credit.

Dunigan instructed the individuals to file the false returns electronically in order to request refund anticipation loans, or "rapid refunds." When a recruited individual received a check for the fraudulent refund, Dunigan, or someone at his direction, would escort the individual to a check-cashing business. To facilitate the cashing of the checks, Dunigan would assist the individuals who filed the false returns to obtain photographic identity cards. Typically, the individual who filed the return received approximately $500. If another person recruited the individual to file the false tax return, that person received $100 to $200. Dunigan kept the balance of the refund.

As a result of Dunigan's scheme, fifty-four false claims for refunds were filed for the 1991 tax year and sixty-four false claims for refunds were filed for the 1992 tax year. Dunigan netted $319,171, of which the IRS was able to recover $7,566. Dunigan owes the remaining $311,605 to three separate banks, all of which made the refund anticipation loans, and to the IRS.

On February 19, 1997, the grand jury charged Dunigan with one count of conspiring to defraud the United States by obtaining or aiding to obtain the payment or allowance of false, fictitious or fraudulent claims, in violation of 18 U.S.C. § 286; and thirteen counts of making and presenting to the IRS claims for payment which he knew to be fictitious and fraudulent, in violation of 18 U.S.C. §§ 2 and 287. Thereafter, Dunigan entered into a plea agreement whereby he pleaded guilty to the conspiracy count.

The Presentence Report (PSR) recommended that the court order Dunigan to pay full restitution. Dunigan objected to a number of items in the PSR, including the amount of recommended restitution. At the sentencing hearing, the district court adopted the factual findings and the recommended application of the guidelines as set forth in the PSR. With respect to restitution, the district court stated:

Consider the amount of the loss, consider the defendant's financial resources. It's true that the defendant does not have a lot of financial resources right now, but this defendant as evidenced by this scheme that he cooked up here to defraud the government has a lot of ability.

I mean, this defendant is not without ability and not without intelligence and he has no dependents as I understand it.

\*     \*     \*     \*     \*     \*

I just think we should set our sights high in this case. It may be in the long run that the defendant is not able to pay all this restitution, but after considering all the factors mentioned in the statute, I do believe that he should be given that opportunity.

\*     \*     \*     \*     \*     \*

And I can't say that he does not have the ability to pay over a period of years. I think I just pointed out [a] while ago that he does have a lot of ability. And he may be able to pay and may not, but I think that at least at this point anything less

than full restitution would be an injustice to the public. So, I think he should restitute the whole amount of restitution.

The district court sentenced Dunigan to 31 months' imprisonment, three years of supervised release, an assessment of $50 and full restitution in the amount of $311,605. This timely appeal followed.

## II.

■Dunigan challenges the district court's order of restitution in the amount of $311,605.00, arguing that the court had no basis to conclude that he would be able to pay that amount.[1] We review de novo whether a restitution order is permitted under the law. *See United States v. Comer*, 93 F.3d 1271, 1278 (6th Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 595, 136 L.Ed.2d 523 (1996). If it is, "we then review the amount ordered under the abuse of discretion standard." *Id.* (citations omitted).

■In determining the amount of restitution that should be ordered, a sentencing court is required to consider the factors listed in 18 U.S.C. § 3664(a),[2] including the defendant's ability to pay. *See United States v. Bondurant*, 39 F.3d 665, 668 (6th Cir.1994). The court must "consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." *Id.* (citing 18 U.S.C. § 3664(a)).

■Dunigan argues that the district court's order of restitution in the amount of $311,605 to be paid within the three-year period of supervised release following his incarceration "clearly exceeds [his] earning potential and ability to pay." Dunigan contends that absent "a miracle," his limited educational background and vocational skills will not enable him to satisfy the restitution order, and the restitution order serves only to "[set him] up for repeated failure."

We share Dunigan's concerns. At the time of sentencing, Dunigan was twenty-eight years old and indigent. Dunigan's educational background includes graduating high school ranked third in his class and completing some college-level course work. Dunigan claims his only assets are two cars, valued at $600 and $500 respectively; however, the PSR indicated that Dunigan's cars were valued at $600 and $3,800 (with a loan balance of $500) and that Dunigan owns tools valued at $150. Dunigan also has "various other miscellaneous debts" and an account balance of $300 at Heilig Meyers department store. Dunigan argues that to satisfy the restitution order he would have to clear $8,656 per month, after taxes, every month for the three-year period of his supervised release. Based on his recent employment history of working at Vita Foam as a foam-cutter for $200 per week and performing handyman jobs for approximately $1000 a month, Dunigan asserts that it will be impossible for him to satisfy the restitution order. Accordingly, Dunigan claims that the district court did not

1. At the outset, Dunigan alleges an ex post facto violation because he asserts that the district court relied upon the mandatory restitution provisions set forth in 18 U.S.C. §§ 2248 and 3663A, which were enacted as a result of the Mandatory Victims Restitution Act of 1996 (MVRA). Dunigan argues that although he was sentenced after the enactment of the MVRA, he committed the offenses before the enactment of the MVRA; hence, the ex post facto problem. In support of his argument, Dunigan notes that the PSR referred to U.S.S.G. § 5E1.1, which requires mandatory restitution for offenses committed after Nov. 1, 1997, *if such restitution is authorized by law*. In citing to the applicable restitution statute, however, the PSR referred to 18 U.S.C. § 3663(a), which *provides for discretionary* restitution. Moreover, upon Dunigan's objections to the PSR, the probation officer clearly stated that the decision to order restitution was within the sound discretion of the district court. Finally, in

sentencing Dunigan, the district court gave no indication that it considered restitution to be mandatory in this case. Because the district court did not rely upon the mandatory restitution provisions, Dunigan's ex post facto argument lacks merit.

In addition, the government did not argue that the MVRA was in fact applicable in this case; therefore we need not address that issue or the issue of whether the application of the MVRA in these circumstances would violate the ex post facto clause.

2. Title 18 U.S.C. § 3664(a) provides in part that "[t]he [presentence] report shall include, to the extent practicable, a complete accounting of the losses to each victim, any restitution owed pursuant to a plea agreement, and information relating to the economic circumstances of each defendant."

properly consider his financial resources and earning ability, as required by 18 U.S.C. § 3664(a).

Dunigan additionally argues that public policy dictates that a district court must give adequate consideration to a defendant's ability to pay. Relying on an Eleventh Circuit case, *United States v. Fuentes,* 107 F.3d 1515 (11th Cir.1997), Dunigan contends that restitution orders in amounts that a defendant cannot likely repay "effectively eliminate the mandate of section 3664(a) that the sentencing court consider the defendant's ability to pay." *Id.* at 1529.

We conclude that the district court did not adequately consider Dunigan's ability to pay, one of the factors set out in 18 U.S.C. § 3664(a). Although the district court noted that Dunigan was intelligent and capable of employment, the district court had absolutely no basis on the record before it to conclude that Dunigan would be able to pay in excess of $8000 per month to satisfy his obligation; in fact, the district court expressed considerable doubt that Dunigan ever would be able to pay. The district court therefore abused its discretion by ordering Dunigan to pay that amount. *See id.* (stating that "[a] district court abuses its discretion when it orders restitution in an amount that it finds the defendant is not likely to be able to pay"). Like the *Fuentes* court, we believe that ordering restitution in an amount that a defendant cannot possibly pay "threatens respect for judicial orders generally" and provides the defendant with "less incentive to seek remunerative, rehabilitative, and non-criminal employment." *Id.* (citation and quotation omitted).

We recognize that the burden is on the defendant to establish a lack of financial resources. *See United States v. Blanchard,* 9 F.3d 22, 25 (6th Cir.1993). We believe that Dunigan has met his burden in this case by establishing that "absent a miracle," he will not be able to satisfy his restitution obligation. Accordingly, we hold that a district court must have, at a minimum, some indication that a defendant will be able to pay the amount of restitution ordered in order to comply with 18 U.S.C. § 3664(a). In this case, the district court abused its discretion by failing to do so.

### III.

For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.